UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JEFFREY A. PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.1:07-CV-276 |
| | )     (Edgar/Carter) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant | ) |

REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner denying the plaintiff a period of disability, disability insurance benefits, and supplemental security income under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of plaintiff's Motion for Judgment on the Pleadings (Doc. 15) and defendant's Motion for Summary Judgment (Doc. 20).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be AFFIRMED.

Plaintiff's Age, Education, and Past Work Experience

Plaintiff was forty-two years old at the date of the ALJ's decision (Tr. 27, 102). He worked in the past as a machine operator, janitorial supervisor, and appliance assembler (Tr. 14, 559-60).

1

These jobs required medium-level exertion as generally performed in the national economy (Tr. 559-60).

## Application For Benefits-Administrative Proceedings

Plaintiff filed applications for disability insurance benefits and supplemental security income in June 2003, alleging that he had been disabled since November 2002 (Tr. 102). Plaintiff's applications were denied initially and upon reconsideration. At Plaintiff's request, an administrative hearing was held on September 22, 2005, at which Plaintiff appeared and was represented by counsel (Tr. 539). In a decision issued October 28, 2005, the ALJ found Plaintiff not disabled because, despite his impairments, he could perform his past relevant work as an appliance assembler, janitorial supervisor, or machine operator (Tr. 50-58). The Appeals Council granted Plaintiff's request for review and remanded Plaintiff's claim for additional proceedings (Tr. 39-40).

A second administrative hearing was held on May 9, 2006, at which Plaintiff was again represented by counsel (Tr. 563). In a decision issued April 17, 2007, the ALJ found Plaintiff not disabled because he could perform his past relevant work despite his impairments (Tr. 13-27). This became the Commissioner's final decision when the Appeals Council declined review (Tr. 5-7). Plaintiff seeks judicial review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## Standard of Review

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were supported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner*

*v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

How Disability Benefits Are Determined

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis. 20 C.F.R. § 404.1520. The five-step analysis is sequential because if, at any

step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further. 20 C.F.R. § 404.1520(a). The following are the five steps in the analysis:

>Step 1: Is claimant engaged in substantial gainful activity? If so, claimant is not disabled. 20 C.F.R. § 404.1520(b).

>Step 2: Does claimant have a "severe" impairment or combination of impairments that significantly limits claimant's ability to do basic work activities, and will foreseeably result in death or last at least twelve months? If not, claimant is not disabled. 20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521.

>Step 3: Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1? If so, the claimant is disabled, and the analysis may end without inquiry into the vocational factors. 20 C.F.R. § 404.1520(d). If inquiry is made into vocational factors, after step three but before step four, the Commissioner evaluates a claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

>Step 4: Does claimant's RFC permit claimant to perform claimant's past relevant work? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f).

>Step 5: Does the claimant retain the RFC to perform other work in the economy? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999). Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC. *Id.*

ALJ's Findings

The ALJ concluded at step four of the sequential analysis that Plaintiff was not disabled because he could perform his past relevant work as an appliance assembler, janitorial supervisor and machine operator. (Tr. 57). The ALJ made the following findings in support of the decision, which are conclusive if they are supported by substantial evidence in the record:

1. The claimant meets the nondisability requirements set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" as discussed in the body of the decision, based on the requirements in the Regulations 20 CFR § 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5. The undersigned finds the claimant's allegations regarding his subjective limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the residual functional capacity described above in the decision (20 CFR §§ 404.1567 and 416.967).

8. The claimant is able to perform his vocationally relevant past work as an appliance assembler, janitorial supervisor and machine operator (20 CFR §§ 404.1565 and 416.965).

9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920 (f)).

(Tr. 26, 27).

## Issues Presented

Plaintiff argues the ALJ's decision should be reversed and disability benefits awarded for the following two reasons:

1. The ALJ erred in affording more weight to a non-treating physician's medical opinion in direct contrast to four disabling medical opinions by three treating physicians.

2. The ALJ erred in improperly construing the medical records and Plaintiff's testimony in discrediting Plaintiff's credibility.

## Plaintiff's Testimony

Plaintiff claimed he was unable to work due to chronic fatigue, sleep apnea, fibromyalgia, back problems, headaches, and depression (Tr. 544). He described severe back pain, for which he had received several epidural steroid injections (Tr. 544). He takes no pain medication during the day, but instead, sleeps to relieve his pain (Tr. 546, 555, 558). He said his concentration and memory were impaired (Tr. 546, 553-54). Plaintiff testified that he was able to sit or be on his feet for one hour each out of an eight-hour period (Tr. 548-49). He described difficulty reaching above his shoulders, and required assistance arising after kneeling or bending at the waist (Tr. 550-51). He described occasionally dropping items, and said he needed both hands to lift a gallon of milk (Tr. 552-53). He claimed to get only two to three hours of sleep per night, despite having used a CPAP machine with oxygen since 2002 (Tr. 547-48).

Plaintiff described having good and bad days (Tr. 551). On a good day, he might try to do laundry, but on a bad day he did little besides watch television (Tr. 551, 558). On a typical day he tried to help his wife perform light household chores such as washing clothes and putting away dishes, but if he over exerted himself, he would be very limited the following day (*id.*).

Relevant Medical Evidence

In November 2002, the month Plaintiff claims he became disabled, he sought treatment for complaints of chest discomfort (Tr. 202, 205, 209, 262). Plaintiff described having been under extreme stress at work and was diagnosed as experiencing atypical chest pain, most likely due to anxiety (Tr. 262). On follow-up examination, Plaintiff continued to complain of chest pain and fatigue (Tr. 260-61). Plaintiff was treated for respiratory infections in December 2002 and February 2003 (Tr. 258-59). He was released to return to work in February 2003, again in March 2003, and twice more in May 2003 (Tr. 252-53, 256-57). On May 12, 2003, the most recent date he was scheduled to return to work, Plaintiff visited his doctor with multiple issues, including myalgia, fatigue, muscle spasms, and untreated sleep apnea (Tr. 250). The following month Plaintiff complained of leg pain (Tr. 246).

In May and June 2003, Plaintiff saw Dr. Bacha (Tr. 224-27). Plaintiff complained that when he awoke he felt tired and unmotivated, and he described occasional shortness of breath (*id.*). Plaintiff was referred to Dr. Craig, a rheumatologist, for evaluation (Tr. 231-33). Dr. Craig believed Plaintiff exhibited fibromyalgia and sleep apnea (*id.*). The following month, electrodiagnostic testing yielded normal results (Tr. 238). When Dr. Craig saw Plaintiff for follow-up, Plaintiff described being unable to work due to pain in his knees and legs (Tr. 240-41). Dr. Craig prescribed medication to relieve muscle cramping, but observed that there was no evidence that Plaintiff had any disabling condition (*id.*).

Plaintiff saw Dr. Bacha again in August 2003 following a sleep study evaluation (Tr. 385-88). The sleep study revealed that Plaintiff experienced improvement with use of a CPAP machine, but Plaintiff claimed to feel no better. Examination yielded normal results, and Dr. Bacha

diagnosed mild sleep apnea (*id.*). Two months later, Plaintiff described himself as feeling much better but sometimes being unable to sleep well. He attributed this more to personal problems than to sleep apnea (Tr. 381) When Dr. Bacha next saw Plaintiff in February 2004, he continued to describe Plaintiff's sleep apnea as "mild," and he described Plaintiff's pulmonary condition as "improving" (Tr. 379).

MRI testing of Plaintiff's spine conducted between August 2003 and January 2004 revealed shallow midline extruded disc fragments from L2 through S1, degenerative changes in his cervical spine most significant at C4-5, and disc protrusion or minor herniation at T7-8 (Tr. 433-35). Dr. Moore reviewed the medical evidence of record in October 2003 and concluded in a Residual Functional Capacity Assessment that Plaintiff could perform medium-level work despite his impairments (Tr. 294-301).

Plaintiff underwent a course of physical therapy from September through December 2003 (Tr. 303-16). Between November 2003 and February 2004, Dr. Ford administered epidural steroid injections to Plaintiff's spine (Tr. 362, 372). In March 2004, Dr. Brown opined that Plaintiff should never lift any weight, push or pull, or reach above shoulder level, and could never bend, kneel, crawl or climb stairs (Tr. 426-28). Dr. Brown further opined that Plaintiff could perform "sedentary" activity for one to two hours per day (*id.*).

Dissatisfied with the treatment he had been receiving, Plaintiff went on-line and found the Fibromyalgia and Fatigue Center (Tr. 570). In March 2005, Plaintiff told Dr. Kelly at the Fibromyalgia and Fatigue Center that he experienced daily pain in his feet and legs and was unable to sleep through the night (Tr. 442). That same month, Dr. Kelly opined that Plaintiff was unable to

8

lift more than ten pounds, could bend only occasionally, and could never kneel, crawl, climb stairs, reach above shoulder level, or push and pull (Tr. 430-31).

Family practitioner Dr. Bullington first saw Plaintiff at the Fibromyalgia and Fatigue Center in September 2005 (Tr. 437). That same month she reported diagnoses of chronic fatigue, fibromyositis, depression, insomnia, and hypothyroidism (Tr. 395-97, 437). Dr. Bullington opined that since March 2003 Plaintiff had been unable to perform any lifting, pushing, or pulling and that he was limited in his ability to stand (Tr. 395-97). She opined that he could perform one hour of sedentary activity and one hour of light activity in an eight-hour work day (*id.*). Dr. Bullington completed a form opining that Plaintiff was unable to perform even sedentary-level work on a full-time basis (Tr. 392-94).

In February, 2006, Plaintiff reported he injured his back in January while moving furniture (Tr. 530). In March 2006, Dr. Bullington wrote a letter opining that Plaintiff was disabled due to fibromyalgia, chronic fatigue syndrome, complex endocrine dysfunctions, chronic infections and immune dysfunction (Tr. 486-88).

Vocational Expert Testimony

The vocational expert (VE) testified that Plaintiff could perform his past relevant work as appliance assembler, and the janitorial supervisor and machine operator as described in the DOT if he was capable of lifting 50 pounds occasionally, and 25 pounds frequently, the residual functional capacity assessed by the ALJ (Tr. 25, 560).

Analysis

The ALJ found that Plaintiff experienced a number of medically determinable impairments that were "severe" for purposes of Social Security disability benefits, including chronic neck and

9

back pain, chronic fatigue, fibromyalgia[1], and obstructive sleep apnea (Tr. 26).

---

[1] **FIBROMYALGIA**
A group of common nonarticular rheumatic disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft-tissue structures. These may be primary and generalized or concomitant with another associated or underlying condition, or localized and often related to overuse or microtrauma factors.

The term **myalgia** indicates muscular pain. In contrast, **myositis** is due to inflammation of muscles tissues and is an inappropriate term for fibromyalgia, when such inflammation is absent. **Fibromyalgia** indicates pain in fibrous tissues, muscles, tendons, ligaments, and other "white" connective tissues. Various combinations of these conditions may occur together as muscular rheumatism. Any of the fibromuscular tissues may be involved, but those of the occiput, low back **(lumbago)**, neck **(neck pain or spasm)**, shoulders, thorax **(pleurodynia),** and thighs **(aches and charley horses)** are especially affected. There is no specific histologic abnormality, and the absence of cellular inflammation justifies the preferred terminology of fibromyalgia rather than the older terms of fibrositis or fibromyositis.

**Etiology**
The condition occurs mainly in females, may be induced or intensified by physical or mental stress, poor sleep, trauma, exposure to dampness or cold, and occasionally by a systemic, usually rheumatic, disorder. A viral or other systemic infection (eg, Lyme disease) may precipitate the syndrome in an otherwise predisposed host. **The primary fibromyalgia syndrome (PFS)** is particularly likely to occur in healthy young women who tend to be stressed, tense, depressed, anxious, and striving, but may also occur in adolescents (particularly girls) or in older adults, often associated with unrelated minor changes of vertebral osteoarthritis. A minority of cases may be associated with significant psychogenic or psychophysiologic manifestations. Symptoms can be exacerbated by environmental or emotional stress, or by a physician who does not give proper credence to the patient's concerns and discharges the matter as "all in the head."

**Symptoms, Signs and Diagnosis**
Onset of stiffness and pain frequently are gradual, diffuse, and of an "achy" character in PFS. In localized form, symptoms are more often sudden and acute. The pain is aggravated by straining or overuse. Tenderness may be present, usually localized in specific small zones; ie, "tender points." There may be local tightness or muscles spasm, though active contractions typically cannot be demonstrated by electromyography. Inflammation is not characteristic and only occurs with an underlying systemic condition. **Diagnosis of PFS** is by recognition of the typical pattern of diffuse fibromyalgia and nonrheumatic symptoms (eg, poor sleep, anxiety, fatigue, irritable bowel symptoms) and by exclusion of significant contributory or underlying disease (eg, generalized OA, RA, polymyositis, polymyalgia rheumatica, or other connective tissue disease), and (most difficult of all) exclusion of psychogenic muscle pain and spasm. Fibromyalgia associated with such disorders (ie, concomitant or secondary fibromyalgia) manifests musculoskeletal symptoms and signs similar to PFS (except for psychogenic

As the Commissioner notes, objective laboratory and clinical testing is of limited value in assessing the severity and resulting functional impact of certain of Plaintiff's impairments such as fibromyalgia and chronic fatigue. *See Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).

Further, fibromyalgia, or fibrositis as it is also referred to, presents unique challenges to the ALJ and the Commissioner because there are no objective medical tests which can assess the severity of the disease or even its very existence. In order to diagnose the disease, a physician must perform tests to rule out other diseases and rely upon subjective symptoms related to the physician by the patient. *See* footnote 1, *supra*. The Sixth Circuit in *Preston v. Sec'y of Health and Human Servs.*, 854 F.2d 815 (6th Cir. 1988), discusses the anomalies of this disease:

---

rheumatism), but requires differentiation from PFS to allow identification and treatment of both the underlying disorder and the fibromyalgia itself. PFS, lime irritable bowel syndrome, is a well-defined dysfunctional entity, readily diagnosed by its characteristic manifestations and by screening tests to exclude underlying conditions. Occult rheumatic disease and hypothyroidism in the middle-aged female should be excluded. Screening tests are normal. Nonspecific and mild histopathologic changes may be present in the muscles, but similar changes are also found in normal control subjects.

**Prognosis and Treatment**
Fibromyalgia may remit spontaneously (in milder cases) with decreased stress but can become chronic or recur at frequent intervals. Relief may be obtained from important supportive measures, such as reassurance and explanation of the benign nature of the syndrome, as well as stretching exercises, improved sleep, local applications of heat, gentle massage, and low-dose tricyclic agents at bedtime (eg, amitriptyline 10 to 25 mg) to promote deeper sleep. Aspirin 650 mg orally q 3 to 4 h or other NSAIDs in full dosages have not been shown to be effective in clinical trials but may help individual patients. Incapacitating areas of focal tenderness may be injected with 1% lidocaine solution, 1 or 2 mL alone or in combination with a 40-mg hydrocortisone acetate suspension (using the technique described for soft tissue injection in the treatment of chronic low back pain, above). A tricyclic antidepressant drug should be used in the lowest effective dose and may be continued indefinitely with monitoring of side effects, if any. If drowsiness occurs with one product, an alternative (in low dose) may be prescribed. Functional prognosis is usually favorable with a comprehensive, supportive program, although some degree of symptoms tends to persist. The Merck Manual, Sixteenth Edition, pp. 1369-1371.

11

> ...fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, *physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients*. The medical literature also indicates that fibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Id.* at 817 (emphasis added.)

> Our task in reviewing this issue is complicated by the very nature of fibrositis. Unlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.

*Id.* at 818.

In *Preston*, the onset date of disability was in dispute. The plaintiff in *Preston* asserted she became disabled by fibrositis in May 1983 while the Secretary of Health and Human Services asserted the plaintiff did not become disabled until March 1986. The plaintiff's treating physician, Dr. Crabbs, opined the plaintiff was disabled prior to March 1986. The Secretary argued Dr. Crabbs could not be relied upon because there was no objective medical evidence to support Dr. Crabbs' opinion. The Sixth Circuit rejected this argument stating:

> Although the opinion of a treating physician, when supported by medical evidence, is entitled to substantial weight in determining disability, *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986), the Secretary argues that such medical evidence is lacking to support Dr. Crabbs' opinion. The Secretary also cites the fairly normal clinical and test results obtained by Drs. Kramer and Bridwell which do not correlate with a disabling disease. However, the CT scans, X-rays, and minor physical abnormalities, noted by these doctors and cited by the Secretary as substantial evidence of no disability before March 26, 1986, are not highly relevant in diagnosing fibrositis or its severity. *As noted in the medical journal articles in the record, fibrositis patients manifest normal muscle strength and neurological reactions and have a full range of motion. Thus, the standard clinical tests and observations conducted by Drs. Bridwell and Kramer to detect*

12

> ***neurological and orthopaedic disease were of little aid or relevance in the diagnosis of Preston's disabling fibrositis, except as a means of excluding certain neurologic or orthopaedic causes of her pain.*** In other words, the findings of Drs. Bridwell and Kramer are not substantial evidence that Preston's fibrositis is not disabling.

*Id.* at 819-820 (emphasis added).

The Sixth Circuit has revisited this issue in *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). In *Rogers*, the Court again recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. 486 F.3d at 234 (citing *Preston*, 854 F.2d at 820).

However, the fact that several physicians assess disabling restrictions, does not mean that an ALJ cannot reject those opinions if there are other opinions and evidence which contradict the disabling opinions and lead to the conclusion Plaintiff does not have disabling restrictions. In *Jordan v. Comm'r of Soc. Sec.*, the Sixth Circuit found substantial evidence existed to support the rejection of the opinions of seven physicians who concluded a plaintiff was completely unable to work, because of conflicting evidence from two consulting physicians, both of whom concluded plaintiff was exaggerating her symptoms and on the basis of video evidence which contradicted plaintiff's claims of disability. No. 07-5876, 2008 WL 4977339, *2, 5 (6th Cir. Nov. 25, 2008) (vacated and remanded on other grounds).

Further, the mere diagnosis of an individual as a person experiencing such conditions does not entitle them to a finding of disability; they must prove that the condition imposes symptoms and functional limitations of sufficient severity as to prevent them from working.

Plaintiff contends that the ALJ erred in weighing the medical opinion evidence of record because she afforded more weight to the opinion of a non-treating physician that was contrary to

three treating physicians' opinions that Plaintiff was disabled (Doc. 16, pp. 3-7). Plaintiff asserts that the ALJ ought to have afforded greater weight to the opinions of Dr. Bullington, Dr. Kelley, and Dr. Brown (*id.*) (citing Tr. 392-93, 428, 430).

The Commissioner argues Plaintiff has not shown that Drs. Kelley and Bullington were treating sources at the time they expressed their opinions that Plaintiff was unable to work. As the ALJ observed, both of these doctors described Plaintiff as experiencing incapacitating limitations following their initial visit with Plaintiff (Tr. 22-23). As of the time these reports were written, it does appear these doctors were not familiar with Plaintiff's condition over a sufficient period to require the deference owed treating physicians. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A review of the record supports the Commissioner's argument that the ALJ did not ignore any line of evidence. She discussed the various doctors' opinions at length and set forth her reason for the weight she afforded the varying opinions (Tr. 22-24). The ALJ referred to the evaluation by Dr. Craig:

> On June 27, 2003, Dr. Craig saw "no" stigmata of a connective tissue disease to suggest an inflammatory arthritis or any "significant" features of an autoimmune disease. He opined that "most likely" the claimant had a fibromyalgia-type picture related to his sleep apnea. Dr. Craig observed that a "significant" number of men who have fibromyalgia actually have sleep apnea with a "dramatic" improvement on C-PAP and BI-PAP . On July 28, 2003, Dr. Craig stated that he had "no" diagnosis of any connective tissue disease. Furthermore, he related that as "far as [the claimant's] disability papers are concerned I do not have any specific diagnosis to be made that he has any disabling condition"

(Tr. 22)

The October 24, 2003 opinion of the state agency physician, James N. Moore, M.D. concluded Plaintiff retained the capacity for "medium" work (Tr. 295). The ALJ further noted that, in a March 2005 examination by Dr. Kelley, Plaintiff had only 10 of 18 tender points, short of the

14

eleven tender points required for a diagnosis of fibromyalgia. The ALJ further noted no pain relief medication was prescribed and no home exercise program prescribed. The ALJ further considered Plaintiff's activities of throwing horseshoes and moving furniture as activities inconsistent with Plaintiff's claimed limitations (Tr. 23).

The ALJ also relied on the August 2006 consultative examination of Dr. Holland (Tr. 533-538). Dr. Holland noted plaintiff to be a tall, well-nourished, physically-fit appearing, white male who ambulated throughout his clinic without noticeable difficulty or gait disturbance. He noted Plaintiff was able to sit and rise from a seated position easily and get on and off an examination table unassisted (Tr. 534). Dr. Holland noted the history of fibromyalgia and chronic fatigue syndrome and noted the difficulty with Fibromyalgia from his standpoint. Dr. Holland's report indicates he reviewed medical records from Plaintiff's fibromyalgia specialist. Dr. Holland noted Plaintiff was being treated aggressively (Tr. 535). After his examination and review of medical records, Dr. Holland also assessed Plaintiff to have the Residual Functional Capacity to perform "Medium" work (Tr. 536, 537).

In this case the ALJ's fact-finding is thorough and complete and the ALJ clearly articulated reasons for rejecting the opinions of those physicians who assessed disabling limitations. If there is substantial evidence to support the Commissioner's findings, they must be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers

15

Case 1:07-cv-00276 Document 22 Filed 12/05/08 Page 15 of 18 PageID #: 79

can go either way, without interference by the courts. I conclude there is substantial evidence to support the conclusion the ALJ reached in this case.

Plaintiff asserts the ALJ erred in improperly construing the medical records and Plaintiff's testimony in discrediting Plaintiff's credibility. As the Commissioner argues, in cases concerning conditions such as Plaintiff's, the ALJ's credibility analysis assumes considerable significance. In assessing Plaintiff's functional capacity, the ALJ expressly found Plaintiff's subjective allegations of incapacitating symptoms and limitations not fully credible (Tr. 17-26). In reaching this conclusion, the ALJ expressly considered factors including the objective medical evidence, medical opinion evidence, Plaintiff's treatment, his medications, and his activities. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ's reasonable weighing of these relevant credibility factors will not be disturbed upon judicial review. Where there is a conflict in medical opinion, as there is here, it is the ALJ's duty to weigh the conflicting medical evidence. The resolution of conflicts in testimony are the province of the Commissioner and not the courts. *Smith v. Heckler*, 760 F. 2d 184, 187 (8th Cir. 1985).

Plaintiff contends that the ALJ erred in finding his subjective allegations not fully credible (Doc. 16, pp. 7-9). Plaintiff suggests that the ALJ erred by basing her credibility finding upon isolated references to Plaintiff's smoking, his compliance with prescribed treatment, and his ability to recall television shows (*id*.). Plaintiff is correct in his argument that his testimony also included the fact that he might not remember the plot in a television show even if he was able to follow the plot (Tr. 554). However, as the Commissioner argues, the ALJ's assessment of Plaintiff's subjective allegations involved many other factors. The ALJ notes Plaintiff's allegation of disability since November 2002 was inconsistent with the objective record which revealed the complaints at

16

Case 1:07-cv-00276   Document 22   Filed 12/05/08   Page 16 of 18   PageID #: 80

that time were not the same as the current complaints, that medical records failed to mention any serious musculoskeletal complaints until February 2003. The ALJ concluded this inconsistency reflected negatively on Plaintiff's general credibility and reliability (Tr. 22).

The Commissioner argues it was reasonable for the ALJ to observe that although Plaintiff claimed to have been disabled due to pain and fatigue since November 2002, the contemporary medical records do not document that he complained of or sought treatment for such symptoms until the following May, after he repeatedly had been released to return to work (Tr. 17, 21). As with many of the credibility factors the ALJ considered, the ALJ noted that this one factor alone was not determinative, but that it contributed to the ALJ's overall conclusion that Plaintiff was not as limited as he alleged (Tr. 21).

The ALJ also noted that Plaintiff's claim that he was unable to work due to constant pain was inconsistent with evidence indicating that he threw horseshoes for enjoyment and injured his back moving furniture (Tr. 20). The ALJ noted that contrary to Plaintiff's testimony, medical records and testing showed that use of a CPAP machine resolved many of his sleep apnea difficulties (Tr. 17). The ALJ noted numerous other inconsistencies which she concluded undermined Plaintiff's credibility. For example, Plaintiff claimed he was unable to sleep at night; yet, he described sleeping during the day to relieve pain (Tr. 20). The ALJ noted that Plaintiff provided inconsistent statements regarding his smoking and drinking (Tr. 21). Plaintiff took no prescription medications on an ongoing basis, despite his claim of disabling pain (Tr. 20). While a reviewing court might consider each of these factors in itself relatively minor, I conclude the above factors in combination support the ALJ's conclusion that Plaintiff's subjective allegations were not fully credible. In making these decisions, the ALJ considers, among other things, whether there are

17

any inconsistencies between the claimant's statements and the rest of the evidence, including, but not limited to, medical signs and laboratory findings, physicians' statements, and the claimant's activities. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Because the ALJ is charged with the responsibility of observing the demeanor and credibility of the witness, his conclusions should be highly regarded. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Conclusion

For the reasons stated herein, I RECOMMEND that the Commissioner's decision be AFFIRMED. I further RECOMMEND that the defendant's Motion for Summary Judgment (Doc. 20) be GRANTED, the plaintiff's Motion for Judgment on the Pleadings (Doc. 15) be DENIED, and this case be DISMISSED. [2]

Dated: December 5, 2008        s/William B. Mitchell Carter
                               UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within ten (10 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).